UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ERIC HUNAULT,

       Plaintiff,

v.

FCA US LLC,

       Defendant.

_____/

Civil Action No. 15-12772
Honorable Robert H. Cleland
Magistrate Judge David R. Grand

### REPORT AND RECOMMENDATION TO GRANT
### DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [25]

Before the Court is the Motion for Summary Judgment filed by Defendant FCA US LLC ("FCA" or the "Company") on March 28, 2016. (Doc. #25). FCA filed a brief and exhibits in support of its motion on April 6, 2016. (Docs. #31, 32). *Pro se* Plaintiff Eric Hunault ("Hunault") filed a response to FCA's motion on May 16, 2016 (Doc. #38), and FCA filed a reply on June 2, 2016 (Doc. #42).

On August 11, 2015, this case was referred by the Honorable Robert H. Cleland to the undersigned for all pretrial purposes. (Doc. #3). Having reviewed the pleadings and other papers on file, the Court finds that the facts and legal issues are adequately presented in the parties' briefs and on the record, and therefore dispenses with oral argument pursuant to E.D. Mich. L.R. 7.1(f).

I.      **REPORT**

      A.      **Factual Background**

            *1.*     *Hunault is Hired by FCA*

Hunault brings this lawsuit against his former employer, FCA, alleging violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §12101 *et seq.* Hunault began working for

FCA as an Electrical Process Engineer in July of 2013, after submitting an electronic application, completing an interview, and receiving a job offer. (Doc. #25 at Ex. A, pp. 21-23, 25, 30; Ex. B). Hunault was assigned to the Manufacturing & Assembly Electrical Test Process group based out of the Company's Chrysler Technical Center ("CTC") in Auburn Hills, Michigan; however, his job required him to travel to and work in assembly plants, primarily in Toledo, Ohio. (*Id.* at Ex. A, p. 30). Hunault's job duties involved, among other things, working with and near machinery and electrical test equipment in assembly plants. (*Id.* at Ex. A, pp. 27-28). He held a salaried bargaining unit position and was represented by the United Automobile Worker union ("Union"). (*Id.* at Ex. A, pp. 24-25). His immediate supervisor was Rudy Starr ("Starr"). (*Id.* at Ex. A, p. 22).

### 2. *FCA Begins to Observe Issues with Hunault's Behavior*

The evidence establishes that, beginning in approximately March of 2014, and continuing through May of 2014, Hunault was experiencing a variety of atypical symptoms that were observable in the workplace. Hunault acknowledges that, at various times during this period, he experienced symptoms that included memory loss, dizziness, confusion, difficulty balancing, "seizures," and an inability to concentrate, speak correctly, or use the telephone. (*Id.* at Ex. A, pp. 36, 42, 82-84, 86-87, 90-92, 150-52; Doc. #38 at 12). In fact, Hunault admitted at his deposition that there were times when he was generally "out of it." (Doc. #25 at Ex. A, p. 134). For example, in mid-April 2014, Hunault apparently got lost on his way to work at the Toledo plant, where he had been working for months, calling Starr from the road to tell him he could not find the right exit and that he "[didn't] know how it happened." (*Id.* at Ex. A, pp. 42-43; Doc. #38 at 12).

During this same timeframe, Starr personally observed odd changes in Hunault's

behavior.  For example, on one occasion, Starr noticed that Hunault did not seem to be his usual self and was acting uncharacteristically "standoffish" and "edgy" while assisting with a new vehicle launch at FCA's Sterling Heights Assembly Plant.  (*Id.* at Ex. C, ¶5).  When Starr asked Hunault what was wrong, he initially said he was fine, but then "quickly stated that he 'needed to go home'" because he was not feeling well.  (*Id.*).  According to Starr, when Hunault came back to work the next day, he was still acting strangely, at one point questioning why Starr was always "watching him" and suggesting that he was being watched through his phone.  (*Id.*).  When Starr explained to Hunault that he was not being watched and asked if anything was wrong, Hunault again abruptly left work early; he was then intermittently absent during late April and early May 2014.  (*Id.*).

Then, on or about May 8, 2014, Hunault appeared at a restricted Investor Day event hosted by FCA executives.  (*Id.* at Ex. A, pp. 50-53; Ex. C, ¶6).  Although not invited to the event, Hunault claims he obtained "permission" to attend from a "guy at the door" who was "chauffeuring people over."  (*Id.* at Ex. A, pp. 53-54).  FCA representatives who observed Hunault at the event deduced that he did not belong there, escorted him out and subsequently alerted Mr. Starr about his inappropriate conduct via e-mail:

> I need to make you aware of an "incident" yesterday that involved one of your employees, Eric Hunault.  As you know, this week the Company has hosted an Investor Event and yesterday those activities included a ride and drive at our CTC evaluation track.  Eric spent considerable time at the ride and drive area (I'm told it may have been as much as two hours), talking with our employees, interacting with some of the Investor participants and helping himself to the food buffet.  Clearly, it took some time for the Engineering support team to recognize that he did not belong.  Once confronted by a member of my Staff, he was escorted to the shuttle vans and did depart, although he apparently was rather non-apologetic and defiant on the walk to the vans.

> I believe the individual requires some counselling at a minimum.  Thanks.

(*Id.* at Ex. C, Att. A).  Moreover, Hunault admitted at his deposition that, while at the event, he

3

probably appeared "confused and disoriented" and likely had a "staring episode."  (*Id.* at Ex. A, pp. 69-72).

### 3.    *Hunault is Off Work for Much of May 2014*

Having learned of Hunault's attendance at the Investor Day event, and in light of his own observations of Hunault's aberrant behavior, Starr became concerned about Hunault's ability to safely and effectively perform his job.  (*Id.* at Ex. C, ¶6).  Thus, on May 9, 2014, when Hunault again called in sick, Starr contacted Hunault's union representative, Todd Raymond ("Raymond"), to discuss his concerns.  (*Id.* at Ex. C, ¶7).  Either Starr or Raymond then apparently called Hunault, asking him to report to the CTC to discuss his presence at the Investor Day event the day before.  (*Id.* at Ex. A, pp. 45-48; Ex. E[1]).  When Hunault balked, Raymond picked him up and took him to lunch to further discuss the situation, something Hunault now characterizes as "invasive" conduct on the part of the Union, saying, "Todd [Raymond] really had no business coming over to my apartment and taking me out to lunch …."  (*Id.* at Ex. A, pp. 47, 49).  After lunch, however, Hunault did not go to the CTC, instead opting to accompany his parents on a camping trip.  (*Id.* at Ex. A, p. 75).

On May 13, 2014, after returning from camping, Hunault presented to the emergency room at McLaren Oakland Hospital, complaining that he had been experiencing memory loss and confusion since St. Patrick's Day.  (*Id.* at Ex. D).  A head CT and other medical tests were normal, however.  (*Id.*).  The next day, May 14, 2014, Hunault drove himself to the psychiatric emergency room at the University of Michigan Hospital.  (*Id.* at Ex. A, p. 91; Ex. E).  At his deposition, Hunault testified that he went there because he "could not think" and "was having problems talking."  (*Id.* at Ex. A, pp. 91-93).  Although some four months later, Hunault

---

[1] This exhibit consists of the handwritten notes of Hunault's mother, which she prepared to document his symptoms and to try to help him.  (*Id.* at Ex. A, pp. 40-41).

diagnosed himself as suffering from carbon monoxide poisoning,[2] it is undisputed that, as of May of 2014, he had no idea what was causing his disturbing and ongoing symptoms.  (*Id.* at Ex. A, pp. 210-12).

It appears that Hunault remained off work on May 15 and 16, 2014.  (*Id.* at Ex. A, p. 95; Ex. E).  On May 19, 2014, he treated with a new family physician, Dr. Irvin Gastman.  (*Id.* at Ex. A, pp. 95-96, 118-19; Ex. E).  Without indicating the specific nature of Hunault's symptoms, Dr. Gastman wrote a note indicating that Hunault was "[t]otally incapacitated" and could not return to work until May 28, 2014, which he sent to FCA's human resources department.  (*Id.* at Ex. A, p. 100; Ex. F).

On May 27, 2014, however – the day before the return-to-work date specified by Dr. Gastman – Hunault unexpectedly appeared at the Toledo Assembly Plant.  Jerry Perez, FCA's Labor Relations Lead, spoke to Hunault, later recapping this interaction as follows in an email to Hunault's management:

> I had a discussion with Eric Hunault in our medical lobby in an attempt to see how we could help him.
>
> Hunault was vague in his answers for questions I had, almost to the point of deception.  He didn't know what type of leave he had been out on, didn't know who his HR rep is, wasn't sure where he was to report today ….
>
> He was not helpful at all.

(*Id.* at Ex. G).

### 4.   *Hunault Has Additional Issues Upon Returning to Work*

When Hunault returned to work at the CTC the next day, he says he had a "serious

---

[2] According to Hunault, he "figured out" in September of 2014 that he had been poisoned by carbon monoxide from his personal vehicle and/or FCA's Toledo Assembly Plant.  (*Id.* at Ex. A, pp. 210-13).  Hunault admitted at his deposition, however, that he has never actually received a medical diagnosis of carbon monoxide poisoning from any doctor.  (*Id.* at Ex. A, pp. 39, 230).

medical problem," wherein his "legs locked up," he felt "like [he] was going to faint," and he was lost and "just stared" at his supervisor.  (*Id.* at Ex. A, p. 205).  On May 30, 2014, Hunault thinks he "fainted" in his cubicle.  (*Id.* at Ex. A, p. 141).  According to Hunault, Starr was standing in his cubicle at the time, trying to talk to him, but Hunault "couldn't hardly talk to him."  (*Id.* at Ex. A, p. 144).

In his affidavit, Starr confirmed that he observed Hunault continuing to exhibit unusual symptoms when he returned to work.  He was "inattentive, could not recall his computer log on credentials and seemed unable to complete standard functions on his computer."  (*Id.* at Ex. C, ¶9).  Because Hunault was scheduled to return to the Toledo Assembly Plant on June 2, 2014, Starr was concerned that his apparent inattentiveness might put him at risk for injury to himself or others in a plant setting.  (*Id.* at Ex. C, ¶10).  Accordingly, Starr again contacted Hunault's union representative, Todd Raymond, and suggested that Hunault needed to be seen in FCA's medical department (a suggestion with which Raymond agreed).  (*Id.* at Ex. C, ¶11).

As a result, Starr and Raymond walked Hunault to the medical department to be seen by company physician Dr. Robert Morris.  (*Id.* at Ex. A, pp. 139-40; Ex. C, ¶11).  Dr. Morris was provided information about the changes observed in Hunault's memory and behavior, beginning a month or two earlier, and both Starr and Raymond expressed concern for Hunault's safety and welfare in the workplace.  (*Id.* at Ex. A, pp. 140-41; Ex. H, ¶2).

When Dr. Morris evaluated Hunault, he found him to be "vague" in responding to questions.  (*Id.* at Ex. H, ¶3).  Hunault did not provide Dr. Morris with any information that might explain the medical and/or behavioral symptoms he had been exhibiting in the workplace; in fact, he denied awareness of any such symptoms.[3]  (*Id.*).  In his affidavit, Dr. Morris avers that

---

[3] Apparently, Hunault did not disclose to Dr. Morris that he had driven himself to the psychiatric

he concluded at the time that "the reported changes in [Hunault's] behavior and lapses in memory, together with his apparent unawareness or unwillingness to acknowledge he was experiencing any problems, warranted medical evaluation to verify that he did not have a medical or mental health condition that would impair his ability to effectively and safely perform his job." (*Id.* at Ex. H, ¶4). Therefore, Dr. Morris instructed Hunault to remain off work pending medical evaluation by his family physician and a mental health professional of his own choosing. (*Id.*). Hunault was told to return to see Dr. Morris in one week, or after both the medical and psychological evaluations were completed, and he was advised to speak to his union representative if he had any questions. (*Id.*). Raymond and a FCA security officer then escorted Hunault to the parking garage, at which point they had to walk multiple levels of the parking structure, with Hunault clicking his key fob, in order to find his car. (*Id.* at Ex. A, pp. 142, 145).

### 5.   Hunault's Employment is Terminated in June of 2014

Although Hunault was instructed to return to the CTC's medical department after obtaining fitness-for-duty confirmation from his family physician and a mental health professional, he admittedly did not do so. (*Id.* at Ex. A, p. 150). When asked at his deposition whether he was "trying to do anything to get the paperwork filled out that Dr. Morris had given [him] to get back to work," Hunault indicated that he "[didn't] know if [he] tried to call for a doctor's appointment or not." (*Id.*). Hunault also admitted that, given his symptoms, he should not have been "cleared [] to come back" to work in May of 2014. (*Id.* at Ex. A, p. 129).

Because Hunault did not return to the medical department or otherwise communicate with the Company, he was sent a letter via certified mail on June 9, 2014 (with a copy to his union representative). (*Id.* at Ex. I). According to FCA, this letter was a standard "five-day"

---

emergency room at the University of Michigan Hospital just two weeks earlier.

letter, which required Hunault to either report to FCA's Employment Office within five business days (on or before June 16, 2014) or explain his inability to report. (*Id.*). The letter, which also warned Hunault that he would be terminated if he did not comply with this directive, was sent to the address Hunault had on file with the Company. (*Id.*). Subsequently, when Hunault did not timely return to work or otherwise respond to the Company's letter, his employment was terminated, effective June 16, 2014. (*Id.* at Ex. J). He was sent notice of the termination via certified mail on June 18, 2014. (*Id.*).

According to Hunault, he did not receive the five-day warning letter because he was hospitalized at McLaren Regional Medical Center in Flint from June 10-12, 2014. (*Id.* at Ex. A, pp. 146-49, 156; Doc. #38 at 75-77, 82-85). After his discharge from the hospital, Hunault then went "up north" for some period of time. (Doc. #25 at Ex. A, p. 158). It is undisputed that, in the months following his meeting with Dr. Morris, Hunault made no attempt to contact his supervisor (or anyone else at FCA); in fact, Hunault went so far as to change his phone number because he "didn't want anything to do with [Starr] at that point." (*Id.* at Ex. A, pp. 150-51, 161-62). A chronology compiled by Hunault and produced during discovery indicates that he put a hold on his mail on June 14, 2014. (*Id.* at Ex. M). Thus, by stopping his mail, changing his phone number, and refusing to contact anyone at FCA, Hunault effectively went "off the grid," leaving FCA in the dark as to both his whereabouts and his work intentions.

### 6.    *The Union Grieves Hunault's Termination*

On June 20, 2014, without his knowledge,[4] Hunault's union filed a grievance challenging

---

[4] At his deposition, Hunault testified that he did not learn of his termination until September of 2014, when he contacted Raymond to "discuss any options [he had] available." (*Id.* at Ex. A, pp. 158-59). When asked what he was doing between June and September of 2014, Hunault responded: "What do you mean? Getting poisoned. Suffering from poisoning I already had by working at [FCA]," adding that he spent those months "[f]alling down off my back porch

his termination and demanding that he be reinstated without loss of seniority or pay.  (*Id.* at Ex. N).  The grievance stated that Hunault did not report to work as required "because of medical related issues that he is currently being treated for."  (*Id.*).  The grievance was denied at the first step of the grievance process on the grounds that Hunault failed to respond to the five-day letter or update the company on his medical condition/treatment.  (*Id.*).

### 7. Hunault Self-Diagnoses Carbon Monoxide Poisoning and Contacts His Union Representative to Discuss His Options

In September of 2014, Hunault purportedly determined with testing equipment that carbon monoxide was leaking into the passenger compartment of his personal vehicle and making him ill.  (*Id.* at Ex. A, pp. 41, 210-12).  In addition to his vehicle, Hunault also alleges at times that he experienced carbon monoxide and/or toxic mold poisoning at the Toledo Assembly Plant.  (*Id.* at Ex. A, pp. 210-11).  Again, however, as of the time of Hunault's deposition, no medical professional had ever diagnosed him with carbon monoxide poisoning.  (*Id.* at Ex. A, pp. 39, 230).

After determining the purported cause of his condition, Hunault contacted Raymond to discuss his options.  (*Id.* at Ex. A, p. 159).  Raymond then met with Cathy Pulliam of FCA's human resources department to discuss Hunault's possible reinstatement.  (*Id.* at Ex. K, ¶6).  On or about October 7, 2014, Pulliam contacted Dr. Morris, asking if there was any medical reason why Hunault should not be reinstated.  (*Id.* at Ex. H, ¶5).  According to Dr. Morris' affidavit, he responded as follows:

> I advised Ms. Pulliam that my recommendation in May was that he should have an evaluation by a primary care physician and a mental health professional before he returned to work.  As of the last time I saw him, he did not believe that there was anything wrong with his attitude, behavior,

_____

because I can't open my door" and "[d]oing a lot of thinking, trying to figure out what's going on."  (*Id.* at Ex. A, p. 159).

> or job performance despite his management's concerns. I had received no
> other medical information from or about Mr. Hunault following his visit to
> Medical on May 30, 2014. I thought that the same issues previously noted
> still needed to be evaluated by his treating physician and a mental health
> professional as previously recommended. I told Ms. Pulliam that I had
> questioned his fitness for duty in May, 2014 and I had received no further
> information after that time that would cause me not to have the same
> concerns over his fitness for duty as of October, 2014.

(*Id.* at Ex. H, ¶6).

In light of Dr. Morris' concerns, as well as the Union's contention that Hunault failed to respond to the five-day letter because of "medical issues," Pulliam advised the Union that Hunault's fitness for duty still needed to be established before he could be considered for reinstatement. (*Id.* at Ex. K, ¶6). Following a process similar to that used for employees seeking to return from disability leave, FCA provided the Union with the names of three psychiatrists; Hunault and the Union were permitted choose to any of the three to perform the independent medical examination. (*Id.* at Ex. K, ¶7). On December 2, 2014, the Union notified Pulliam that Dr. Jeffrey Kezlarian, a board-certified psychiatrist, had been selected. (*Id.* at Ex. K, ¶8).

Dr. Kezlarian examined Hunault on December 18, 2014.[5] According to Dr. Kezlarian, Hunault's mental status examination revealed "an alert and passively cooperative man," who "laughed and smiled, most often inappropriately, throughout the interview." (*Id.* at Ex. H, Att. C, p. 8). His affect was "inappropriately bright," his mood was "guarded and anxious," and his insight was "poor." (*Id.*). Dr. Kezlarian diagnosed Hunault with atypical psychosis[6] stated as

---

[5] One of the many exhibits Hunault attached to his response is his own transcription of a recording he made of Dr. Kezlarian's examination (without the doctor's knowledge or permission). (Doc. #38-1 at 33-60). Although Hunault repeatedly refers to purportedly "illegal" questions asked by Dr. Kezlarian, he does not identify any such questions with specificity. Moreover, the Court has reviewed the transcription in its entirety and finds no evidence that any of Dr. Kezlarian's questions were prohibited or otherwise contravened the ADA.

[6] In the 433-page PowerPoint presentation he submitted to the Court, Hunault attacks this diagnosis and asserts that Dr. Kezlarian's "gross exaggerations from the truth make [Hunault]

10

follows, in relevant part:

> Mr. Hunault is clearly impaired.  It is hard to determine because he is quite well defended.  He offers multiple explanations for erratic behaviors.  He attributes his difficulties to either black mold, carbon monoxide poisoning, or bad reactions to a series of antibiotics for a skin infection in his lower back.
>
> *        *        *
>
> In summary, I think the patient does suffer from an atypical form of psychotic illness, whether it be bipolar or some form of schizophrenic process is hard to determine.
>
> *        *        *
>
> The patient shows no insight into any emotional difficulties that might be contributing to his erratic behavior.  He sees it all connected to organic, toxic, or allergic reactions.
>
> *        *        *
>
> Psychiatrically speaking, I do not feel comfortable in returning him to work.  Not much has really changed, though he does report a lot of the symptoms have resolved.  Neuropsychological testing was advised to further clarify what I think is an intelligent man who is showing elements of major psychiatric illness.

(*Id.* at Ex. H, Att. C, pp. 9-10).  After reviewing Dr. Kezlarian's report, Dr. Morris concurred in the recommendation that Hunault not be returned to work.  (*Id.* at Ex. H, ¶10).  Consequently, Ms. Pulliam met with Hunault's union representatives on or about January 8, 2015, at which time she advised them that, based on the results of the independent medical examination, Hunault would not be reinstated.  (*Id.* at Ex. K, ¶11).

        *8.    The Instant Lawsuit*

On August 6, 2015, Hunault filed the instant lawsuit against FCA.  (Doc. #1).  In his complaint, Hunault alleges that FCA impermissibly required him to undergo a "pre-offer"

---

wonder if [Dr. Kezlarian] is a psychopath or just a con artist."  (Doc. #38-6 at 51).

medical examination, in violation of the ADA.[7]  (*Id.*).  FCA now moves for summary judgment, arguing that Hunault was not a "job applicant" at the time of the challenged medical examination, and that its request that Hunault undergo such an examination was "job-related and consistent with business necessity," in accordance with the ADA.  (Doc. #25).

### B.    Standard of Review

Pursuant to Federal Rule of Civil Procedure 56, the Court will grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Pittman v. Cuyahoga County Dep't of Children & Family Servs.*, 640 F.3d 716, 723 (6th Cir. 2011).  A fact is material if it might affect the outcome of the case under governing law.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In determining whether a genuine issue of material fact exists, the Court assumes the truth of the non-moving party's evidence and construes all reasonable inferences from that evidence in the light most favorable to the non-moving party.  *See Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006).

The party seeking summary judgment bears the initial burden of informing the Court of the basis for its motion, and must identify particular portions of the record that demonstrate the absence of a genuine dispute as to any material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009).  "Once the moving party satisfies its burden, 'the burden shifts to the nonmoving party to set forth specific facts showing a triable issue.'"  *Wrench LLC v. Taco Bell Corp.,* 256 F.3d 446, 453 (6th Cir. 2001) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)).  In

---

[7] Previously, Hunault filed a charge of discrimination, in which he also claimed that he was denied a reasonable accommodation.  (Doc. #25 at Ex. O).  Although Hunault does not explicitly allege in his complaint that he was denied a reasonable accommodation in violation of the ADA, the Court will discuss this issue further in section I.C.2, *infra*.

response to a summary judgment motion, the opposing party may not rest on its pleadings, nor "'rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact' but must make an affirmative showing with proper evidence in order to defeat the motion." *Alexander*, 576 F.3d at 558 (internal quotations omitted).

### C.    Analysis

#### 1.    *FCA Did Not Violate the ADA by Requiring Hunault to Undergo a Reinstatement Medical Evaluation*

The principal issue in this case is whether FCA violated the ADA's prohibition on pre-employment medical inquiries when it required Hunault to be evaluated by a psychiatrist before considering returning him to work in December of 2014.  Specifically, Hunault contends that, because he did not first receive an offer of employment, FCA's requirement that he be evaluated by a psychiatrist was an illegal pre-employment medical examination in violation of 42 U.S.C. §12112(d)(2).  For the reasons set forth below, however, Hunault's claim is not viable.

The ADA provision on which his claim is based, 42 U.S.C. §12112(d)(2), by its terms, applies only to "job applicants," and there is no genuine issue of material fact that Hunault was not a job applicant at the time of the challenged medical examination.  Rather, in the context of a union grievance seeking his reinstatement, Hunault was a returning employee with known medical issues; as such, FCA was within its rights in requiring him to undergo a medical examination that was "job-related and consistent with business necessity," pursuant to 42 U.S.C. §12112(d)(4)(A).

##### a.    Hunault Should be Regarded as a "Returning" Employee, Not a "Job Applicant" Within the Meaning of §12112(d)(2)

The ADA generally prohibits covered employers from conducting a pre-employment medical examination of a "job applicant."  42 U.S.C. §12112(d)(2).  The ADA provides an exception to this rule, however, when a conditional job offer has been made.  Specifically:

> A covered entity may require a medical examination **after an offer of employment has been made to a job applicant and prior to the commencement of the employment duties of such applicant**, and may condition an offer of employment on the results of such examination ….

42 U.S.C. §12112(d)(3) (emphasis added).  Hunault alleges, then, that FCA violated the ADA when it required him to submit to a medical examination before extending him a conditional job offer.

The problem with Hunault's argument, however, is that it is directly contradicted by both the plain language of the statutory provision on which he relies, and by case law interpreting that provision.  As an initial matter, §12112(d)(2), by its express terms, applies only to "job applicants."  As FCA points out, the term "applicant" is not defined in the statute and, thus, carries its ordinary meaning.  *See Binno v. American Bar Ass'n*, 826 F.3d 338, 346 (6th Cir. 2016).  An "applicant" is "[a] person who submits a formal application … for a position, especially as part of recruitment or selection process; a candidate."  The Oxford English Dictionary (11th ed. 2008).  As the facts set forth above make clear, Hunault does not fit the definition of an applicant.

Hunault has offered no evidence that he submitted an application for employment in December of 2014,[8] nor has he shown that the Company was soliciting applications for his former job.  Rather, the requirement that Hunault undergo a medical examination in December of 2014 arose in the context of discussions between FCA and the Union, which had filed a grievance on Hunault's behalf, demanding his reinstatement.  Hunault had no direct contact with the Company regarding the requested medical examination (or anything else).  Rather, it was the Union that reached out to FCA – more than four months after Hunault's termination – and sought

---

[8] In contrast, when Hunault was first hired by FCA, he completed a job application and went through the Company's standard hiring process, with no involvement of or help from the Union. (Doc. #25 at Ex. A, pp. 21-23; Ex. B).

his reinstatement.[9]   It was the Union that communicated with FCA regarding the medical evaluation, the Union that received the list of three psychiatrists, and the Union that notified FCA that Dr. Kezlarian had been selected.  (Doc. #25 at Ex. K, ¶8).

Hunault cites no testimony or record evidence disputing the fact that FCA requested a psychiatric examination in the context of discussions with the Union regarding the grievance filed seeking his reinstatement.  Indeed, the only "evidence" Hunault presents in support of his argument is his own assertion that the Union (not FCA) purportedly characterized the exam as being necessary for "rehire,"[10] which Hunault argues triggers the application of §12112(d)(2).  (Doc. #25 at Ex. A, pp. 168-69; Doc. #38 at 4, 15).  Even assuming the truth of this assertion, however, the fact that the Union may have used the word "rehire" is insufficient to create a genuine issue of material fact as to whether he was a "job applicant" within the meaning of §12112(d)(2) at the time of the challenged medical examination.[11]

Moreover, case law undermines Hunault's argument that §12112(d)(2) applies on the facts of this case, where a former employee with a known medical issue seeks re-employment

---

[9] In his voluminous response, Hunault disputes that he was required to undergo a medical examination in the context of grievance negotiations, claiming that the grievance had already been denied before such "illegal medical inquiries."  (Doc. #38-4 at 79).  This argument is without merit as, again, Hunault simply disappeared from June to September of 2014, making no attempt to contact FCA during this time and even changing his phone number to avoid contact. (Doc. #25 at Ex. A, pp. 150-51, 161-62).  Thus, there is no evidence whatsoever (and it would make no sense) that FCA would have considered re-employing Hunault except in the context of the Union's grievance and demand for reinstatement.

[10] Elsewhere, however, Hunault somewhat inconsistently testified that the Union told him "it was a fitness for duty exam to return to work."  (Doc. #25 at Ex. A, p. 176 (emphasis added)).

[11] This is particularly true because the rationale behind the prohibition on pre-employment medical examinations is that individuals with disabilities must be allowed a fair opportunity to be judged on their qualifications – to get past that initial barrier where an employment decision might be unfairly made based on disabilities, rather than abilities.  *See Harris v. Harris & Hart, Inc.*, 206 F.3d 838, 841 (9th Cir. 2000).  Here, where FCA already had information about a known – rather than hidden – disability, the concerns addressed by §12112(d)(2) are nonexistent.

with the same employer following his termination.  *Grenier v. Cyanamid Plastics, Inc.*, 70 F.3d 667 (1st Cir. 1995), a case cited by FCA, is directly on point.  In that case, the plaintiff was a former employee whose employment had been terminated while he was on disability leave by automatic operation of the company's disability policy.  *Id.* at 669.  After his termination, the plaintiff applied to be rehired into his previous position; without extending a job offer, the employer requested a certification from the plaintiff's physician stating he was fit to return to work.  *Id.* at 670.  When the plaintiff failed to provide such certification, his application was rejected, and he filed suit, alleging, *inter alia*, that the employer violated §12112(d)(2)'s prohibition on pre-employment medical inquiries and examinations.  *Id.* at 670-71, 676.

The district court granted summary judgment in favor of the employer, and the First Circuit affirmed, holding that "an employer does not violate §12112(d)(2) of the ADA by requiring a former employee with a recent known disability applying for re-employment to provide medical certification as to ability to return to work ...."  *Id.* at 678.  The court observed that "neither Congress nor the EEOC took into account the case of a returning employee when formulating the restrictions on pre-offer inquiries," and held that, in the case of an employee returning to work following known employment-inhibiting medical issues, "the employer must be able to assess the extent of the applicant's recovery from inability to perform."  *Id.* at 677.  Therefore, the court concluded that a terminated employee with known medical issues should be "treated as an existing employee returning from disability leave" and, as a result, "the employer would be able to demand medical certification of ability to return to work."  *Id.* at 676-77.

The facts of the instant case are even stronger in FCA's favor.  Here, Hunault did not independently seek or re-apply for employment; rather, he was a terminated employee whose union sought his reinstatement.  FCA knew that Hunault had been experiencing unexplained

16

symptoms prior to his termination; and, indeed, the grievance challenging his termination explicitly stated that Hunault failed to respond to the five-day letter "because of medical related issues."  (Doc. #25 at Ex. N).  Under the circumstances, FCA did not violate §12112(d)(2) by requiring Hunault to undergo a medical examination to show that he was fit for duty before reinstatement.  *See also Harris v. Harris & Hart, Inc.*, 206 F.3d 838, 843-44 (9th Cir. 2000) (refusal to rehire a former employee with a known disability without a medical release was not an illegal pre-offer medical inquiry under the ADA; it was "both logical and legal" for employer to request a medical release).

b.    The Required Medical Exam was Job-Related
and Consistent with Business Necessity

As discussed above, Hunault's situation is more akin to an employee attempting to return from a disability leave than to a "job applicant."  Under such circumstances, an employer's ability to require an employee to undergo a medical examination is governed by 42 U.S.C. §12112(d)(4)(A), which only permits medical examinations that are "job-related and consistent with business necessity."

Courts have recognized that such a request for a medical examination is job-related and consistent with business necessity when:  (1) the employee requests an accommodation; (2) the employee's ability to perform the essential functions of the job is impaired; or (3) the employee poses a direct threat to himself or others.  *See Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804, 812 (6th Cir. 1999) (stating "health problems that significantly affect an employee's performance of essential job functions justify ordering a physical examination"); *Hawthorne-Burdine v. Oakland Univ.*, 158 F. Supp. 2d 586, 600 (E.D. Mich. 2016).  Relevant factors considered by courts in determining whether there is evidence that could cause a reasonable person to inquire as to whether the employee is still capable of performing his job and/or poses a direct threat to

17

himself or others include:   (1) the manifestation or symptom of a disability affecting an employee's conduct; (2) the frequency of occurrences; (3) the nature of the job; (4) the specific conduct at issue; and (5) the working environment.  *See Yarberry v. Gregg Appliances, Inc.*, 625 F. App'x 729, 739 (6th Cir. 2015).

In this case, as set forth above, the undisputed evidence establishes that Hunault was having numerous medical and behavioral issues in the workplace that caused FCA to have legitimate concerns about whether he could perform the essential functions of his job without the threat of danger to himself or others.  Specifically:

- Hunault appeared to be having memory, recall, and attention problems.  (Doc. #25 at Ex. A, pp. 82-87, 90-92, 150-52; Ex. C, ¶5).  For example, on one occasion, Hunault got lost and was unable to find his exit while driving to a facility he had been to daily for several months.  (*Id.* at Ex. A, pp. 42-43; Doc. #38 at 12).

- Hunault showed up at an executive event uninvited and, by his own admission, was likely "confused and disoriented" and "most likely" had a staring episode. (Doc. #25 at Ex. A, pp. 70, 72, 138).

- At one point, Hunault asked Starr why Starr was always "watching him" and suggested that he was being watched through his phone.  (*Id.* at Ex. C, ¶5).

- In his interactions with FCA officials, Hunault was "vague in his answers," "almost to the point of deception[.]"  (*Id.* at Ex. C, Att. B).

- Hunault had a "serious medical problem," during which his "legs locked up," he felt "like [he] was going to faint" and "hit the floor," and he "just stared" at his supervisor.  (*Id.* at Ex. A, p. 205).

- Hunault almost or actually "fainted in his cubicle" and was "trying to talk" to his supervisor, but "couldn't hardly talk to him."  (*Id.* at Ex. A, pp. 141, 144; Doc. #38 at 12).

- Hunault "got lost in the parking deck at work trying to find his car."  (*Id.* at Ex. A, pp. 142, 145; Doc. #38-5 at 30).

All of these incidents took place within a two-month period in April and May of 2014 and were noticeably different from what management had observed of Hunault in his first eight months of employment with the Company.   Both Hunault's supervisor and his union

representative reported having concerns about his well-being and safety, as well as certain aberrant behavior they witnessed.  (Doc. #25 at Ex. C, ¶10; Ex. H, ¶4; Ex. E ("Todd [Raymond] said that [Hunault] was having memory problems [and] he could be a danger to himself or others around machinery.")).  Likewise, Dr. Morris had concerns following his examination of Hunault.  (*Id.* at Ex. H, ¶¶3-4, 7).  Indeed, Hunault admits that he could not do his job as of May of 2014 (*Id.* at Ex. A, pp. 236-37), and FCA had no information indicating that his condition had changed between that time and December 2014, when it requested he undergo a psychiatric examination.[12]  Courts have found the job-relatedness and business necessity standard satisfied on lesser facts than these.  *See, e.g., Barnum v. Ohio State Univ. Med. Ctr.*, 2016 WL 683251, at *7 (6th Cir. Feb. 19, 2016) ("significant evidence" found that would cause a reasonable person to inquire whether the employee is still capable of performing her job where concerns were expressed about the employee's ability to concentrate, employee could not perform a routine task on one occasion, and co-worker reported that employee made a comment about suicidal thoughts); *Pena v. City of Flushing*, 2016 WL 3182708, at *2-5 (6th Cir. June 7, 2016) (job relatedness and business necessity standard satisfied where employee demonstrated aberrant behavior, including "drifting off," "talking gibberish," "not finishing sentences," and then giggling and apologizing because he had not taken his medications that day).  In light of this case law, and given the undisputed facts in this case, there remains no genuine issue of material fact that the medical examination required by FCA was both job-related and consistent with business

---

[12] Hunault argues that FCA should not have required him to submit to a psychiatric examination because he submitted a note from Mouaz Sbei, M.D., a neurologist, dated October 16, 2014, indicating that he was "cleared [] to return to work."  (Doc. #38 at 4).  What the note actually said, however, was only that Hunault was "neurologically clinically intact"; it contained no diagnosis or information about his ability to work.  (Doc. #25 at Ex. H, Att. B).  Moreover, when Dr. Morris contacted Dr. Sbei to discuss his note, Dr. Sbei concurred that a psychiatric examination was a good idea.  (*Id.* at Ex. H, ¶8; Doc. #38 at 100).

necessity.  As such, summary judgment is appropriate.[13]

### 2.    To the Extent Hunault Argues a "Failure to Accommodate," Such a Claim Fails

Although not alleged in his complaint, Hunault asserted in his charge of discrimination and at his deposition that FCA should have offered him an unpaid leave of absence as a reasonable accommodation.  (Doc. #25 at Ex. A, pp. 102, 107-08, 172-73; Ex. O).  Even assuming that a "failure to accommodate" claim is properly before the Court, which FCA disputes, summary judgment nevertheless would be appropriate on such a claim.

To establish a prima facie case of failure to accommodate, Hunault must show that:  (1) he was disabled under the ADA; (2) he was otherwise qualified for the position, with or without reasonable accommodation; (3) his employer knew or had reason to know of his disability; (4) he requested a reasonable accommodation; and (5) the employer failed to provide the reasonable accommodation.  *See Johnson v. Cleveland City Sch. Dist.*, 443 F. App'x 974, 982-83 (6th Cir. 2011).

Assuming solely for purposes of this analysis that Hunault was in fact disabled under the

---

[13] The Court has reviewed and considered Hunault's voluminous opposition to FCA's motion for summary judgment.  (Doc. #38).  This filing consists of a two-page response to FCA's motion, a supporting affidavit, and more than 800 pages of exhibits, including internet printouts regarding the ADA, numerous articles about carbon monoxide poisoning, and a 433-page PowerPoint presentation.  (*Id.*).  The lengthy PowerPoint presentation contains numerous slides which appear to have little to do with the legal issues discussed herein, including a slide regarding the causes of amnesia; a slide titled "Discrimination by Euphemism," with a picture of a cupcake and a figure skater; a slide entitled "Summary of FCA's Management Tactics," with a picture of a bear and wolves digging at the ground; a slide with a photo of Michael J. Fox appearing on the David Letterman show; a slide with a photo of Edgar Allan Poe, who purportedly described carbon monoxide poisoning more than 175 years ago; a photo illustrating Pavlov's dog experiment; slides with photos of card games, puzzles, chess, and dominoes; a photo of Hunault's dog, "Bob"; and a slide entitled "Stereotypes are Wrong," with a picture of a bear snuggling a lion.  While Hunault clearly spent a significant amount of time and effort preparing this PowerPoint presentation, it does nothing to establish a genuine issue of material fact as to any of the issues discussed herein.

ADA and qualified for his position, the undisputed record evidence establishes that at no time prior to the termination of his employment in June of 2014 did he request any accommodation. (Doc. #25 at Ex. A, pp. 170-72). Rather, after seeing Dr. Morris on May 30, 2014, and being asked to obtain fitness for duty assessments, Hunault simply left work and was not heard from again. He went "up north" and failed to return to work (or notify the Company why he could not return to work), even going so far as to change his phone number so that he could not be contacted by his FCA supervisor. In written statements made during the investigation of his charge of discrimination, Hunault twice confirmed that he did not ask FCA for an accommodation.[14] (*Id.* at Ex. P, Q). And, at his deposition, Hunault made clear that he requested no accommodation when seeking reinstatement in December 2014, saying, "I'm not disabled and I asked for no accommodations when I went to rehire in." (*Id.* at Ex. A, p. 170).

In his response, Hunault denies that he abandoned his job and maintains that he sought an accommodation (in the form of a medical leave that he "was contractually able to receive").[15] (Doc. #38 at 2). These assertions, however, are belied by the evidence of record. Specifically:

- Despite the fact that Hunault now claims he did not abandon his job, he admitted at his deposition that, after he was sent home on May 30, 2014, to get medical documentation of his fitness for duty, he did not obtain the requested documentation, nor did he make any further attempt to contact FCA. (Doc. #25 at Ex. A, pp. 149-55). Indeed, after a brief hospital stay (from June 10-12, 2014), Hunault drove himself up north and deliberately changed his phone number to

---

[14] Specifically, on both an "intake questionnaire" and a "supplemental questionnaire," Hunault responded "no" to questions asking whether he had requested an accommodation at work, or "any changes or assistance to do [his] job because of [his] disability." (Doc. #25 at Ex. P; Ex. Q).

[15] Hunault also asserts that his mother "requested medical leave" for him, allegedly by sending a text message to Raymond (his union representative). (Doc. #38-5 at 71). Even assuming this is true, which is not evidenced in the record, there is no evidence that Raymond conveyed such a request to FCA. Hunault's own unsupported assertions to the contrary are insufficient to survive summary judgment. *See Gooden v. City of Memphis Police Dept.*, 67 F. App'x 893, 895 (6th Cir. 2003) ("Conclusory allegations, speculation, and unsubstantiated assertions are not evidence, and are not enough to defeat a well-supported motion for summary judgment.").

avoid contact with Starr.  (*Id.*).

- In his response, Hunault states that he received "last rites" on July 3, 2014, apparently implying that he was too ill to contact FCA during the summer of 2014.  (Doc. #38-5 at 7).  During this same timeframe, however, Hunault apparently was lucid enough to draft an email to a former co-worker requesting a letter of recommendation, seeking advice on bringing a mold-related worker's compensation claim against FCA, and providing his new phone number.  (Doc. #38-2 at 39).

- Hunault also asserts in his response that leave should have been offered before his termination with nothing more than a doctor's note stating that he had a "personal illness."  (Doc. #38-5 at 3).  Hunault cites no authority, however, nor is there any, for the proposition that an employer is obligated under the ADA to unilaterally offer unpaid leave based on nothing more than a generic doctor's note, with no medical corroboration of an ADA disability and no interactive dialogue about possible accommodations.  Regardless, Hunault was sent home on May 30, 2014, to see his doctor, and he never returned – with or without a doctor's note.

Under the circumstances, where the evidence clearly establishes that Hunault never requested an accommodation, summary judgment is appropriate on any type of "failure to accommodate" claim Hunault now tries to bring.[16]  *See Melange v. City of Center Line*, 482 F. App'x 81, 84 (6th Cir. 2012) (prima facie case requires showing that plaintiff "requested an accommodation").

## II.    RECOMMENDATION

For the reasons set forth above, **IT IS RECOMMENDED** that FCA's Motion for Summary Judgment (**Doc. #25**) be **GRANTED**, and that Hunault's action be **DISMISSED** in its entirety and with prejudice.

---

[16] To the extent Hunault argues that he should have been automatically provided an unpaid leave of absence in June of 2014, pursuant to paragraph 66 of the applicable collective bargaining agreement ("CBA"), such argument fails.  Again, there is no evidence that either Hunault or the Union requested application of paragraph 66 prior to his termination.  Moreover, any claim Hunault now makes that he was contractually entitled to such leave is preempted by Section 301 of the Labor Management Relations Act, 29 U.S.C. §185, as it seeks to enforce a provision of a CBA.  Where Hunault has not alleged that he fully exhausted such a claim, nor has he alleged a breach of the duty of fair representation by his union and a breach of the CBA by his former employer, any such contractual claim fails as a matter of law.

Dated: October 26, 2016                          s/  David R. Grand
                                                 DAVID R. GRAND
                                                 UNITED STATES MAGISTRATE JUDGE

## REVIEW

Either party to this action may object to and seek review of this Report and Recommendation, but must act within fourteen days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and Fed. R. Civ. P. 72(b)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of HHS*, 932 F.2d 505 (6th Cir. 1991)*; United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  Filing objections which raise some issues but fail to raise others with specificity will not preserve all objections that party might have to this Report and Recommendation.  *See Willis v. Sec'y of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  A copy of any objection must be served upon this Magistrate Judge.  *See* E.D. Mich. L.R. 72.1(d)(2).

*Note these additional requirements at the direction of Judge Cleland:*

Each **objection must be labeled** as "Objection #1," "Objection #2," etc., and **must specify** precisely the provision of this Report and Recommendation to which it pertains.  Not later than fourteen days after service of objections, **the non-objecting party must file a response** to the objections, specifically addressing each issue raised in the objections in the same order and labeled as "Response to Objection #1," "Response to Objection #2," etc.  The response must be **concise and proportionate in length and complexity to the objections**, but there is otherwise no page limitation.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on October 26, 2016.

s/Eddrey O. Butts
EDDREY O. BUTTS
Case Manager
